**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EVELYN “EVIE” PARTS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SWARTHMORE COLLEGE**<br><br>**and**<br><br>**PETER CARROLL,**<br>**VALERIE GOMEZ, BRAD KOCH,**<br>**AND CHRISTINA EPPS- CHIAZOR**<br><br>**and**<br><br>**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**<br><br>**Defendants.** | **CIVIL ACTION NO. 2:25-CV-4702-CMR**<br><br>**JURY TRIAL DEMANDED**<br><br>**ORAL ARGUMENT REQUESTED** |

**CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS’ MOTIONS TO DISMISS PLAINTIFF’S SECOND AMENDED COMPLAINT (Dkts. 31 and 32)**

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................1

I. Evie Has Adequately Pled a Title IX Claim Against All Named Defendants............1

A. Defendants Denied Evie Equal Athletic Opportunity When They Denied Benefits That Other Members of the Track Team Received................................1

B. Title IX Contains a "Clear Statement" that Swarthmore's Conduct Was Prohibited Such that Evie May Seek Monetary Damages...................................5

C. Evie May Seek Monetary Damages Because Swarthmore's Discrimination Was Intentional ...........................................................................................10

D. The NCAA's Funding Status Does Not Warrant Dismissal of the Claims Against It.............................................................................................10

II. Evie Sufficiently Pled State Law Claims That Are Not Superseded by *B.P.J.* or Title IX.................................................................................................11

A. The Pennsylvania Statutes Cannot Be Interpreted as Identical to Title IX Because There is Something "Specifically Different" in Their Language .........13

B. Pennsylvania is Entitled to Provide Protection that Extend Beyond the Federal Law and Title IX Does Not Preempt Pennsylvania Law .......................15

III. The Second Amended Complaint Sufficiently States a Claim for Intentional Infliction of Emotional Distress...............................................................19

A. Pennsylvania Recognizes the Tort, and the Pleading Standard is Settled...........20

B. The Swarthmore Defendants' Conduct Can Reasonably Be Regarded as Outrageous .......................................................................................21

C. Defendants' Argument That They Cannot be Held Responsible for Intentional Infliction of Emotional Distress Under *B.P.J.* and Related Cases Wholly Fails ...........................................................................................24

D. The Second Amended Complaint Sufficiently Pleads Severe Emotional Distress and Physical Harm ........................................................................25

E. The NCAA Is Liable for Its Own Conduct and for Aiding Swarthmore's Conduct.............................................................................................26

IV. The Second Amended Complaint Sufficiently States Claims for Civil Conspiracy ....27

V. Any Deficiency Should be Addressed by Amendment, Not Dismissal With Prejudice ....30

CONCLUSION ....30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.H. v. Minersville Area Sch. Dist.*,
408 F. Supp.3d 536 (M.D. Pa. 2019) ... 3

*Aetna Inc. v. Insys Therapeutics, Inc.*,
324 F. Supp. 3d 541 (E.D. Pa. 2018) ... 29

*Anderson v. Upper Bucks Cnty. Area Vocational Tech. Sch.*,
373 A.2d 126 (Pa. Commw. Ct. 1977) ... 19

*Angus v. Shiley Inc.*,
989 F.2d 142 (3d Cir. 1993) ... 26

*Arizona v. United States*,
567 U.S. 387 (2012) ... 15

*Arlington Central School District Board of Education v. Murphy*,
126 S.Ct. 2455 (2006) ... 5

*Austin v. Hill*,
No. 11-2847, 2014 WL 1386338 (E.D. Pa. Apr. 9, 2014) ... 27

*Baker v. Rangos*,
324 A.2d 498 (Pa. Super. Ct. 1974) ... 28

*Barnes v. Gorman*,
536 U.S. 181 (2002) ... 5

*Barret v. West Chester University of Pennsylvania*,
2003 WL 22803477 (November 1, 2003) ... 2

*Baugh v. Robert Morris Univ.*,
No. CV16-430, 2018 WL 1400063 (W.D. Pa. Mar. 20, 2018) ... 3

*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985) ... 10

*Bennett v. New Jersey*,
470 U.S. 632 (1985) ... 6

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020) ... 3, 9

*Bowers v. NCAA*,
118 F. Supp. 2d 494 (D.N.J. 2000) ........ 11

*Boyanowski v. Cap. Area Intermediate Unit*,
215 F.3d 396 (3d Cir. 2000) ........ 30

*Bro-Tech Corp. v. Thermax, Inc*
651 F. Supp. 2d 378 (E.D. Pa. 2009) ........ 29

*Brown v. Board*,
347 U.S. 483 (1954) ........ 18

*C.E.R. 1988, Inc. v. Aetna Cas. And Sur. Co.*,
386 F.3d. 263 (3d. Cir. 2004) ........ 15

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ........ 11

*Cerra v. East Stroudsburg Area School District*,
299 A.2d 277 (Pa. 1973) ........ 19

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ........ 5

*Davis Next Friend LaShonda D. v. Monroe County Board of Education*,
119 S. Ct. 1661 (1999) ........ 7, 10

*Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
606 F. Supp. 3d 124 (E.D. Pa. 2022) ........ 10

*Doe v. Boyertown*,
897 F.3d 518 (2018) ........ 9

*Doe v. Moravian Coll.*,
No. 5:20-cv-00377, 2023 WL 144436 (E.D. Pa. Jan. 10, 2023) ........ 21, 22

*Fogleman v. Mercy Hospital, Inc.*,
283 F.3d 561 (3d Cir. 2002) ........ 14

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
503 U.S. 60 (1992) ........ 10

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) ........ 13, 18

*Goldstein v. Phillip Morris, Inc.*,
854 A.2d 585 (Pa. Super. Ct. 2004) .......... 27

*Hall v. Millersville University*,
22 F. 4th 397 (3d. Cir. 2022) .......... 5, 8

*Houser v. Feldman*,
600 F. Supp. 3d 550 (E.D. Pa. 2022) .......... 29

*Hoy v. Angelone*,
720 A.2d 745 (Pa. 1998) .......... 20

*Humphries v. Pa. State Univ.*,
492 F. Supp. 3d 393 (M.D. Pa. 2020) .......... 26

*Jackson v. Birmingham Board of Education*,
544 U.S. 167 (2005) .......... 5, 8, 10

*Kazatsky v. King David Mem'l Park, Inc.*,
527 A.2d 988 (Pa. 1987) .......... 22, 25

*Kelly v. Jones*,
148 F. Supp. 3d 395 (E.D. Pa. 2015) .......... 20

*Kemether v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*,
15 F. Supp. 2d 740 (E.D. Pa. 1998) .......... 3

*Koken v. Steinberg*,
825 A.2d 723 (Pa. Commw. Ct. 2003) .......... 27

*Kornegey v. City of Philadelphia*,
299 F. Supp. 3d 675 (E.D. Pa. 2018) .......... 26

*Landor v. Louisiana Department of Corrections and Public Safety*,
609 U.S. 59 (2026) .......... 12, 15

*Lujan v. Mansmann*,
956 F. Supp. 1218 (E.D. Pa. 1997) .......... 25

*Marion v. Bryn Mawr Tr. Co.*,
288 A.3d 76 (Pa. 2023) .......... 27

*MGJ v. Sch. Dist. of Phila.*,
No. 17-318, 2017 WL 2277276 (E.D. Pa. May 25, 2017) .......... 22

*Murphy v. National Collegiate Athletic Association*,
138 S. Ct. 1461 .................................................. 16

*NCAA v. Smith*
525 U.S. 459 .................................................. 11

*New York v. U.S.*,
505 U.S. 144 (1992) .................................................. 12, 15

*NRA Grp., LLC v. Durenleau*,
154 F.4th 153 (3d Cir. 2025).................................................. 29

*Papieves v. Lawrence*,
263 A.2d 118 (Pa. 1970) .................................................. 20

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .................................................. 5, 6

*Pennsylvania v. Navient Corp.*,
967 F.3d. 273 (3d. Cir. 2020).................................................. 17

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008).................................................. 11, 30

*Reeves v. Middletown Athletic Ass'n*,
866 A.2d 1115 (Pa. Super. Ct. 2004) .................................................. 25

*Rey v. Univ. of Pittsburgh Sch. of Dental Med.*,
182 F. Supp. 3d 282 (W.D. Pa. 2016) .................................................. 3

*Samian Group, LLC, v. Coopersburg Associates, Inc.*,
650 F. Supp. 3d. 295 (EDPA 2023).................................................. 15

*San Antonio Independent School District v. Rodriguez*,
411 U.S. 1 (1973).................................................. 18

*Simpson v. Phila. Sheriff's Off.*,
351 F. Supp. 3d 919 (E.D. Pa. 2019) .................................................. 21

*Summy-Long v. Pennsylvania State Univ.*,
226 F. Supp. 3d 371 (M.D. Pa. 2016) .................................................. 3

*Taylor v. Albert Einstein Med. Ctr.*,
754 A.2d 650 (Pa. 2000).................................................. 20

*Thompson Coal Co. v. Pike Coal Co.*,
412 A.2d 466 (Pa. 1979) ........ 28, 29

*Tingley – Kelly v. Trustees of the University of Pennsylvania*,
677 F.Supp.2d 764 (E.D. Pa. 2010) ........ 2

VII. *General Electric Co. v. Gilbert*,
429 U.S. 125 (1976) ........ 19

*W. Virginia v. BPJ ex rel Jackson*,
609 U.S. 958, 146 S. Ct. 2356 ........ 1-2, 4-5, 13-14, 18-20, 25, 30

*Walkup v. Santander Bank, N.A.*,
147 F. Supp. 3d 349 (EDPA 2015) ........ 16

*Williams v. School District of Bethlehem*,
998 F.2d 168 (3d Cir. 1993) ........ 2

*Wyeth v. Levine*,
555 U.S. 555 (2009) ........ 16

**Statutes**

20 U.S.C. §1001 ........ 18, 19

20 U.S.C. §1232 ........ 18

20 U.S.C. §1400 ........ 18

20 U.S.C. § 1098g ........ 17

20 U.S.C.A. §1681(a) ........ 1, 6, 14

24 Pa. Stat. Ann. § 5004(a) ........ 13

24 Pa. Stat. Ann. § 5004(b) ........ 11

24 Pa. Stat. Ann. § 5009(a) ........ 13

29 U.S.C. §794 ........ 18

42 U.S.C. §2000d ........ 18
42 U.S.C. §2000e-7 ........ 16

42 U.S.C.A. §2000a ........ 16

43 Pa. Stat. Ann. § 955(e) ........ 11

43 Pa. Stat. Ann. § 955(i) ........ 13

43 Pa. Stat. Ann. § 962(a) ........ 13

Article I [of the United States Constitution ........ 12

Pub. L. No. 95-555, 92 Stat. 2076 ........ 19

W. Va. Code Ann. § 18-2-25d (West) ........ 4

**Rules**

Fed. R. Civ. P. 9(b) ........ 28

**Regulations**

16 Pa. Code §41.206 ........ 14, 23

16 Pa. Code § 41.202 ........ 13

16 Pa A.D.C. §41.204 ........ 14

22 PA A.D.C. 32.3(2)(ii) ........ 15

34 C.F.R. §106.4 ........ 8

34 C.F.R. §106.41 ........ 7

34 C.F.R. §106.41(b) ........ 2, 14

34 C.F.R. §106.41(c) ........ 2

34 C.F.R. §106.6(c) ........ 7

34 C.F.R. § 106.6(h) ........ 17

**Other Authorities**

Restatement (Second) of Torts § 46 ........ 20-25
Restatement (Second) of Torts § 876 ........ 26, 27

Plaintiff, Evelyn "Evie" Parts, by and through her undersigned counsel, respectfully submits this consolidated memorandum in opposition to the Swarthmore Defendants' motion to dismiss the Second Amended Complaint and the NCAA's motion to dismiss the Second Amended Complaint.

**ARGUMENT[1]**

**I. Evie Has Adequately Pled a Title IX Claim Against All Named Defendants**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation, be denied benefits, or be subjected to discrimination under any educational program or activity receiving federal financial assistance." 20 U.S.C.A. §1681(a). Evie was a member of the Swarthmore College Track Team ("Track Team") and was subjected to discrimination when Swarthmore College, through Brad Koch, Christina Epps-Chiazor, Peter Carroll, and Valerie Gomez (collectively "Swarthmore Athletics Officials") denied Evie the benefits that other members of the women's track team received. (Second Am. Compl. "SAC" ¶¶53, 64, 70, 75,78-84, 88) Defendant Swarthmore College receives federal financial assistance and is, therefore, subject to the narrow "denial of benefits" wording of Title IX. (SAC ¶16-19).

**A. Defendants Denied Evie Equal Athletic Opportunity When They Denied Benefits That Other Members of the Track Team Received**

Evie was a member of the Swarthmore College Track Team for the entire 2024-2025 season. (SAC). At no point was Evie ever removed from the roster. (SAC). While she was never kicked off the Team, from February 6, 2025 through April 11, 2025 ("Restricted Period"), Swarthmore College denied Evie benefits that other members of the Track Team received, thereby denying her what she is guaranteed under Title IX - equal athletic opportunity. *W. Virginia v. BPJ*

[1] Plaintiff incorporates the facts in the Second Amended Complaint as if fully set forth herein.

*ex rel Jackson*, 609 U.S. 958, 977 ("…the Title IX regulations guarantee "equal athletic opportunity.")

In order to prevail over a claim for denial of benefits and access under Title IX, Evie must establish: (1) that the program receives federal funding, (2) she was denied benefits, and (3) the denial is based on gender. *Tingley – Kelly v. Trustees of the University of Pennsylvania*, 677 F.Supp.2d 764, 775 (E.D. Pa. 2010). Evie adequately alleges each of these elements against Swarthmore College. (SAC). First, Evie sufficiently pleads that Swarthmore College receives federal funds. (SAC ¶19).

Second, Evie adequately pleads that she was denied benefits (equal athletic opportunity) during the Restricted Period. (SAC ¶¶53, 64, 70, 75,78-84, 88). Title IX requires that all recipients "provide equal athletic opportunity." 34 C.F.R. §106.41(b), *see also W. Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 2356, 2373 (2026)("…Title IX regulations guarantee "equal athletic opportunity."). The federal regulations define equal opportunity by an assessment of factors. 34 C.F.R. §106.41(c)(scheduling of games and practice times; travel and per diem allowance; opportunity to receive coaching and academic tutoring; assignment and compensation of coaches and tutors; locker rooms, practice and competitive facilities; medical and training facilities and services; housing and dining facilities and services; publicity). In 1979, the Office of Civil Rights ("OCR") issued a Policy Interpretation on Title IX ("OCR Interpretation") that remains in use. A copy of the OCR Policy Interpretation is attached hereto as Exhibit A. Courts look to this Interpretation when evaluating cases based on equal athletic opportunity and benefits. *Williams v. School District of Bethlehem*, 998 F.2d 168, 176 (3d Cir. 1993), *see also Barret v. West Chester University of Pennsylvania*, 2003 WL 22803477, *5 (November 1, 2003). The Second Amended Complaint specifies the benefits that Swarthmore College took away from Evie: access to

transportation, medical care, competition uniform, the ability to compete on behalf of her school, coaching, per diem money, all of which are enumerated factors in the federal regulations. (SAC ¶¶53, 64, 70, 75,78-84, 88).

Third, Evie adequately pled that the denial of benefits was based on sex. (SAC ¶56-93). Plaintiff repeatedly pled that she was denied benefits because she is a transgender woman. (SAC ¶¶63, 80, 82, Count I); *see W. Virginia v. BPJ ex rel Jackson*, 609 U.S. 958, 959 ("The term "sex" in Title IX, the Javitz Amendment, and the Title IX regulations cannot plausibly be interpreted to refer to anything other than biological sex."), *see also Id.* at 2373 (Gorsuch, J., concurring)("…as we detailed in [*Bostock*] discriminating against a person for being…transgender necessarily entails discriminating against that person at least in part because of [that person's] biological sex. All of that is consistent with the course the Court takes today."), *see also, Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 660, 140 S. Ct. 1731, 1741, 207 L. Ed. 2d 218 (2020) ("…it is impossible to discriminate against a person for being…transgender without discriminating against that individual based on sex.") [2].

---

[2] Courts often apply Title VII guidance and case law when evaluating Title IX disparate treatment claims. *See Kemether v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 15 F. Supp. 2d 740, 755 (E.D. Pa. 1998); *see also, Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371, 411–12 (M.D. Pa. 2016), aff'd, 715 F. App'x 179 (3d Cir. 2017); *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp.3d 536, 572 (M.D. Pa. 2019); *Rey v. Univ. of Pittsburgh Sch. of Dental Med.*, 182 F. Supp. 3d 282, 293 (W.D. Pa. 2016); *see also, Baugh v. Robert Morris Univ.*, No. CV16-430, 2018 WL 1400063, at *12-13 (W.D. Pa. Mar. 20, 2018).

For the discrete issue of maintaining separate sports teams, the Supreme Court found that the Title VII/*Bostock* framework was inapplicable. Because Title IX regulations provide for separate sports teams for men and women, the Title VII framework is inapplicable as to that standalone issue (of separate sports teams). *B.P.J.*, 146 S. Ct. at 2373("…the only question here is whether schools may limit women's and girls' sports to biological females – a question that was not addressed by *Bostock*…"), *see also Id.* at 2384 (Gorsuch, J., concurring)(Differentiating from Title VII, "Title IX anticipates and approves single-sex living accommodations and sports teams in school settings; it does not treat them as unlawful discrimination.")

When the College denied Evie the benefits because she is a transgender woman, they denied benefits based on her sex. The College denied Evie access to benefits because her sex-assigned-at-birth (biological sex) is male – not female. Nevertheless, each moving Defendant argues that *West Virginia v. B.P.J. ex rel Jackson*, 609 U.S. 958 (2026) precludes Evie from bringing any cause of action under Title IX, overstating the effect of the Supreme Court's narrow ruling. Doc. No. 32 at 5, Doc. No. 31 at 4-5. *B.P.J.* is limited to athletic-team eligibility and does not govern this case. 609 U.S. at 978. Evie's case concerns the disparate treatment of an athlete already on the team, a question *B.P.J.* did not decide. *Id.* at n. 1.

*B.P.J.* involved two plaintiffs (both transgender females) seeking to be on the women's school sports teams in their respective states which had specific laws that barred transgender women from being on the women's team.[3] 609 U.S. 958 (2026). The Supreme Court held that: (1) the definition of "sex" for the purposes of Title IX shall be the sex-assigned-at birth (biological sex); and (2) maintaining separate teams based on sex-assigned-at-birth (biological sex) does not interfere with the "equal athletic opportunity" guaranteed by Title IX. *W. Virginia v. B. P. J. by Jackson*, 609 U.S. 958, 968 (2026). Pennsylvania has no such laws that bar transgender women from being on the women's teams.

*B.P.J.* decided "only" whether schools may limit women's and girls' sports teams to individuals who were assigned-female-at-birth (biological females). It did not decide whether a school may treat an athlete already on the team differently because she is transgender. *B.P.J* at

[3] *Idaho Code Ann*. § 33-6203 (West) ; W. Va. Code Ann. § 18-2-25d (West). Pennsylvania has no equivalent law.

978. Here, Evie was denied equal benefits given to her teammates and thereby equal athletic opportunity when Swarthmore stripped her away of the benefits guaranteed by Title IX. (SAC).

### B. Title IX Contains a "Clear Statement" that Swarthmore's Conduct Was Prohibited Such that Evie May Seek Monetary Damages

Swarthmore argues that Title IX, as Spending Clause legislation, requires that there be a "clear statement that conduct is prohibited before they can be held liable for money damages." Swarthmore Defs.' Mot. to Dismiss Second Am. Compl. at 6 n.3 (incorporating Doc. No. 22-1 at 10–16). The clear-notice rule flows from the nature of Spending Clause legislation. Such legislation "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because "[t]here can, of course, be no knowing acceptance if a [recipient] is unaware of the conditions or is unable to ascertain what is expected of it," Congress must state its conditions unambiguously. *Id*. "Spending Clause legislation operates based on consent." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022). For the same reason, a remedy is available under such legislation "only if the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature." *Barnes v. Gorman*, 536 U.S. 181, 187 (2002). When evaluating whether such clear notice exists, courts view the statute in question "from the perspective of the [recipient] who is engaged in the process of deciding whether to accept." *Arlington Central School District Board of Education v. Murphy*, 126 S.Ct. 2455, 2459 (2006). When assessing notice, courts begin with the statute's text. They then consider the implementing regulations, judicial precedent, and agency guidance in effect when the recipient accepted the funds. *See Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), *see also Hall v. Millersville University*, 22 F. 4th 397, 406-407 (3d. Cir. 2022)(finding "additional support" for notice in OCR guidance.)

Here, the statute is clear: No person shall, "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This text has not changed since 1979. *Id.*

Swarthmore's Title IX obligations are those in effect when it accepted the federal funds. *See, Bennett v. New Jersey*, 470 U.S. 632, 640 (1985).("Practical considerations related to the enforcement of the requirements of grant-in-aid programs also suggest that expenditures must presumptively be evaluated by the laws in effect when the grants were made.") Swarthmore violated Title IX in February, March and April of 2025. SAC ¶58-90. Per *Arlington Central School District*, courts must view the notice issue from the perspective of the recipient considering taking the funds. 126. S.Ct. at 2459 (2006). It follows that the obligations that apply to Swarthmore are those that were in place at the time they accepted funds for the 2024-2025 academic year.

In *Bennett v. New Jersey*, the United States Supreme Court found that when the State of New Jersey received Title I educational funding in 1970, the conditions relating to the state's expenditure of those funds, were determined by the regulation in effect when the state received such funds. 470 U.S. at 640 (1985)("…New Jersey when it applied for and received [federal funds] for the years 1970-1972, had no basis to believe that the propriety of the expenditures would be judged by any standard other than the one in effect at the time."), *see also Pennhurst v. Halderman*, 451 U.S. 1, 25 (1981)("Though Congress' power to legislate under the spending power is broad, it does not include surprising participating states with post acceptance or 'retroactive conditions.'").

The violative conduct complained of here occurred in the spring of 2025. Evie pled multiple times in the Second Amended Complaint that Swarthmore was on notice of its obligations under Title IX, and was aware that their actions were in violation of the statute. She has met the controlling pleading standard. The Court cannot define the obligations Swarthmore took on without knowing when the College applied for and accepted the federal funding for the 2024-2025 academic year. Those dates are not in the pleadings and are within Swarthmore's control. Accordingly, they are proper subjects for discovery, not grounds for dismissal.

Whenever Swarthmore applied for and accepted the federal funds, the benchmark for equal athletic opportunity was the same: the ten factors outlined in the Title IX regulations have not changed since 1980. *See* 34 C.F.R. §106.41(Identifying the benefits of athletic participation as components of equal opportunity, including equipment and supplies, travel and per diem allowances, coaching, and medical and training services.)[4]

The Supreme Court has relied on the implementing regulations to find that a funding recipient had notice of its obligations under Title IX. *See Davis Next Friend LaShonda D. v. Monroe County Board of Education*, 119 S. Ct. 1661, 1671 (1999). In *Davis*, the Supreme Court found that Title IX proscribes harassment with sufficient clarity- through the regulations- that satisfies the notice requirement. *Id.*("…Title IX's regulatory scheme has long provided funding recipients with notice that they may be held liable for their failure to respond to non agents' discriminatory acts.").

[4] The regulations also clearly notified Swarthmore that the NCAA could not displace Swarthmore's independent obligations under Title IX. *See* 34 C.F.R. §106.6(c)("The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization…association…which would render a student ineligible.") Swarthmore cannot hide behind the NCAA. The Title IX obligations were Swarthmore's own, and Swarthmore knew it.

Further, in *Jackson v. Birmingham Board of Education*, the School Board defendant claimed that it was not on notice that it could be liable for retaliating against an employee who complained of a Title IX violation. 544 U.S. 167, 182 (2005). The Supreme Court in that case made clear that notice can come from regulations and case law. *Id.* at 183-184. "The regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years." The Court went further and considered the precedent: "the Courts of Appeals that have considered the question at the time of the conduct at issue in this case all had interpreted Title IX to cover retaliation." *Id.* Based on the context of the regulations and case law, the Court concluded that "a reasonable school board" would realize liability for retaliation. *Id.* at 182. The analysis of notice under Title IX has never been confined to the statute's bare text. Regulations count, and so do court decisions. And as seen in *Hall v. Millersville*, OCR Guidance counts as well. 22 F. 4th 397, 406-407 (3d. Cir. 2022).

Here, the Title IX regulation at issue had been on the books for 46 years. *See* 34 C.F.R. §106.4. The OCR Policy Guidance that is referenced today, has not been changed since 1979. Exhibit A. The Title IX Field Investigator Manual provides further support to the regulations, and that has not been changed since 1990. A copy of the Title IX Investigator's Field Manual is attached as Exhibit B. The benefits Swarthmore denied Evie are not abstractions. They are listed in the regulations and explained in OCR's guidance and Investigator's Manual. *See* Exhibits A and B. Swarthmore cannot credibly claim surprise. The regulations and OCR's guidance and case law notified them that denying these benefits violates Title IX.

In their Motions to Dismiss, Swarthmore asks the wrong question. They contend that they could not have known that Title IX protects "gender identity." Swarthmore Defs. Mot. to Dismiss First Am. Compl. at 6-11. Swarthmore recounts the history of Title IX regulations and the

*Cardona* decisions on the question of "gender identity" and Title IX. *Id.* Swarthmore even goes as far to say that they were unsure whether transgender people were protected under Title IX. *Id.* at n. 9)("It is worth noting, then, that members of Congress have attempted to amend Title IX to add protections for transgender people. These efforts have failed.") None of this addresses Evie's claim. Evie's Title IX claims are not based on "gender identity." SAC at Count I. Evie alleges that Swarthmore College violated Title IX when they treated her differently because she is a transgender woman- because of her sex-assigned at birth- the very thing Title IX has prohibited since 1972. Whether Title IX also reaches "gender identity" as a freestanding category is beside the point.

The case law also put Swarthmore on notice that they had an obligation not to discriminate against transgender women. In 2020, the Supreme Court held that discrimination based on transgender status and sexual orientation is discrimination based on sex for the purposes of Title VII. *See Bostock v. Clayton County*, 590 U.S. 644, 650-651(2020). *Bostock* construed Title VII, but the holding turned on the meaning of discrimination on the basis of sex. *Id.* Two year earlier, in 2018, the Third Circuit agreed that "barring transgender students from restrooms that align with their gender identity would itself pose a potential Tile IX violation." *Doe v. Boyertown*, 897 F.3d 518, 533 (2018). Long before the 2024-2025 academic year, Swarthmore was on notice that excluding and disadvantaging a student because she is transgender implicates Title IX.

Evie sufficiently pled that Swarthmore was on notice that their actions violated Title IX. SAC ¶¶61, 62, 64-65, 99. Further, Swarthmore's position that they did not have clear notice that Title IX required them to not discriminate against transgender women is a factual denial, not a pleading defect. This cannot be credited on a motion that requires every reasonable inference to

be drawn in Evie's favor. *See Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 130 (E.D. Pa. 2022).

### C. Evie May Seek Monetary Damages Because Swarthmore's Discrimination Was Intentional

Swarthmore's clear-notice argument fails as to Count I additionally because their actions were intentional. The Spending Clause does not bar a private damages action under Title IX "where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). It has been adequately pled that Swarthmore has, in fact, engaged in intentional conduct. SAC ¶¶59-89. The Supreme Court has repeatedly held that the notice problem "does not arise in a case such as this, in which intentional discrimination is alleged." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74–75 (1992). "*Pennhurst* does not preclude private suits for intentional acts that clearly violate Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005). Nor does the rule require that "every improper expenditure has been specifically identified and proscribed in advance." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 666 (1985). Swarthmore's own Associate Director of Athletics understood the NCAA policy to concern competition, writing that it "literally forces us, as an NCAA member, to restrict competition for only some of our student-athletes." SAC ¶ 65. Swarthmore chose to follow the NCAA policy only acted *after* consulting its General Counsel *and* its Title IX leadership. SAC ¶¶ 59, 61, 68. The Second Amended Complaint thus sufficiently alleges intentional conduct that violates the clear terms of the statute.

### D. The NCAA's Funding Status Does Not Warrant Dismissal of the Claims Against It

The NCAA argues that it is not subject to Title IX because it does not receive federal financial assistance. NCAA's Mot. to Dismiss Second Am. Compl. at 4–6. That question cannot

be resolved on the pleadings. In *NCAA v. Smith*, the Supreme Court held only that dues payments from members do not make the NCAA a recipient. 525 U.S. 459, 470 (1999). It expressly left open whether the NCAA "directly and indirectly receives federal financial assistance." *Id.* at 469–70. Whether an entity receives federal assistance indirectly depends on facts about its relationships and operations. *See Bowers v. NCAA*, 118 F. Supp. 2d 494, 527 (D.N.J. 2000) (finding "a genuine issue of material fact" on whether the NCAA was "a recipient of federal financial assistance"), *amended on other grounds on reargument*, 130 F. Supp. 2d 610 (D.N.J. 2001). The decision on which the NCAA relies, *Gaines v. NCAA*, No. 1:24-cv-01109 (N.D. Ga. Sept. 28, 2026), ECF No. 196, was a ruling on summary judgment after discovery. [5]

Further, the NCAA's funding status has no bearing on the state-law claims against it. The NCAA relies on the principle that "Congress knew how to impose aiding and abetting liability when it chose to do so." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994). The General Assembly chose to do so. The PFEOA and the PHRA make it unlawful for "any person" to "aid, abet, incite, compel or coerce" a prohibited practice. 24 Pa. Stat. Ann. § 5004(b), 43 Pa. Stat. Ann. § 955(e). Liability under those provisions does not depend on whether the person receives public funds. The Second Amended Complaint properly alleges that the NCAA approved Swarthmore's arrangement for Evie, refused to recognize her amended birth certificate, and provided guidance on implementing the restrictions. SAC ¶¶ 75, 115–16, 147–51.

## II. Evie Sufficiently Pled State Law Claims That Are Not Superseded by *B.P.J.* or Title IX

[5] If the Court concludes that the Second Amended Complaint must allege the NCAA's receipt of federal assistance with greater particularity, Plaintiff requests leave to amend. *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) ("[I]f a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile."). If the NCAA receives federal financial assistance, its participation in the restrictions imposed on Evie is actionable under Title IX as its own conduct regardless of the label Count III bears.

Swarthmore College is a private institution that consented to accept federal funding. SAC ¶16-19. The strings attached to the federal funds are conditions in place for them to maintain the funding. *See Landor v. Louisiana Department of Corrections and Public Safety*, 609 U.S. 59, 63 (2026) The Spending Clause does not confer Congress the power to regulate conduct or regulate a recipient's actions in each jurisdiction where the money is spent. *Id.* at 67. As we noted above, the spending clause framework is particular to legislation that conditions a grant of funds. "While the [Spending] Clause may allow Congress to raise and spend money in support of the 'general welfare'…it did not 'endow Congress with [any] power to regulate conduct." *Id.* If the Spending Clause were to confer regulatory authority of Congress, "Article I [of the United States Constitution] would be rendered largely pointless, and the Nation would trade a limited federal government for an 'unlimited one.'" *Id.* at 67.

The Spending Clause does not provide the federal government the power to command a state to abide by a federal policy choice- although it can certainly encourage a state to conform to a federal policy. *New York v. U.S.*, 505 U.S. 144, 165-166 (1992)("This is not to say that Congress lacks the ability to encourage a State to regulate in a particular way, or that Congress may not hold out incentives to the States as a method of influencing a State's policy choices.") Swarthmore seems to confuse the strings attached to Swarthmore College, as being attached to the General Assembly. Doc. No. 31, 6-11. That is not so. *See, New York v. U.S.*, 505 U.S. 144, 168 (1992)("Where Congress encourages a state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people.")

The reasoning on which Swarthmore relies rests on the Spending Clause. Justice Gorsuch, whose concurrence Swarthmore cites, reasoned that "[n]othing in Title IX clearly and

unambiguously alerts funding recipients that they are prohibited from restricting a school-sponsored sports team to biological women or girls." *West Virginia v. B.P.J.*, 146 S. Ct. 2356, 2383 (2026) (Gorsuch, J., concurring). That reasoning depends on a constitutional limit on Congress's spending power. It does not bind the General Assembly of Pennsylvania, and it supplies no reason to narrow statutes that impose their obligations directly.

Moreover, Title IX, as opposed to other statutes, is one of "condition" not an "outright prohibition." *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998)(distinguishing Title IX from Title VII.) The PFEOA and the PHRA are outright prohibitions. They are exercises of the Commonwealth's police power, and they bind covered institutions whether or not those institutions receive public funds. 24 Pa. Stat. Ann. § 5004(a), 43 Pa. Stat. Ann. § 955(i). No contract is involved, and no consent is required. Defendants cite no Pennsylvania authority applying a clear-notice rule to either statute.

Pennsylvania law instead directs the opposite rule of construction. The PHRA "shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply." 43 Pa. Stat. Ann. § 962(a). The PFEOA contains the same directive. 24 Pa. Stat. Ann. § 5009(a). So do the regulations that implement both statutes. 16 Pa. Code § 41.202. A rule that resolves doubt in favor of a funding recipient has no place in statutes the General Assembly directed courts to construe in favor of their purposes.

### A. The Pennsylvania Statutes Cannot Be Interpreted as Identical to Title IX Because There is Something "Specifically Different" in Their Language

Swarthmore contends that there is "no reason to believe" the Pennsylvania Supreme Court would depart from *B.P.J.* in construing the PFEOA and the PHRA. Swarthmore Defs.' Mot. to Dismiss Second Am. Compl. at 6. Swarthmore argues that the PFEOA and the PHRA must be

interpreted in accordance with Title IX, and thereby *B.P.J.* *Id.* at 6-11. Defendants make the blanket argument that the PHRA and PFEOA must be interpreted consistently with the federal anti-discrimination laws. *Id*., NCAA's Mot. to Dismiss Second Am. Compl. at 8.

Swarthmore relies on *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002), for the proposition that the PHRA and PFEOA "[are] to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." Swarthmore Defs.' Mot. to Dismiss Second Am. Compl. at 7 (miscited as "Fogelman"). *Fogleman* involved a plaintiff who brought claims of retaliation under the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA") and the PHRA. 283 F.3d at 564. The Appeals Court described the anti-retaliation provision of the PHRA as "substantially similar to the federal anti-retaliation provisions found in the ADA, ADEA and Title VII." *Id.* at 567. The Court went on to say that in situations where the state law language is substantially similar- almost identical- to the federal law, then the state law would be interpreted as identical. *Id.* However, where – as here -- "there is something specifically different in its language" then the statutes would be treated differently. *Id.* Unlike the retaliation provisions at issue in *Fogleman*, the provisions of PFEOA and the PHRA are specifically different from Title IX. *See*, 20 U.S.C. §1681(a), Pa. Stat. §955, Pa. Stat. §5004, 16 Pa. Code §41.206, 16 Pa A.D.C. §41.204. First, the Title IX definition of "sex" as confirmed by *B.P.J*, is biological sex (sex-assigned-at-birth). *W. Virginia v. B.P.J.*, 146 S.Ct. at 2373. The definition of sex under the PHRA and the PFEOA is: (1) pregnancy, (2) sex-assigned-at-birth, (3) gender- including gender identity and gender expression, (4) sexual orientation, (5) difference in sexual development, variation of sexual characteristics or other intersex characteristics. 16 Pa. Code §41.206. Further, Title IX permits separate sports teams based on sex. 34 C.F.R. §106.41(b), see also *B.P.J*. at 2373.

Neither the PFEOA nor the PHRA have a comparable term. The PFEOA regulations permit "separation by sex…within physical education class or activities during participation in contact sports…" 22 PA A.D.C. 32.3(2)(ii). There is simply no requirement for schools to maintain separate teams. *Id.*

### B. Pennsylvania is Entitled to Provide Protections that Extend Beyond the Federal Law and Title IX Does Not Preempt Pennsylvania Law

As we explained above, Title IX has no bearing on the PHRA and PFEOA. Title IX is a function of the Spending Clause of the United States Constitution, and merely sets out the terms that go along with receiving funds. *Landor v. Louisiana Department of Corrections and Public Safety*, 609 U.S. 59, 63 (2026) The Supreme Court explained in *New York v. United States,* "[i]f a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant." So long as the state's statutes or regulations are not preempted. 505 U.S. 144, 168 (1992). None of Evie's claims are preempted by federal law. Again, while Congress can encourage a state to abide by policy, the states have every right to police the activities within their own borders.

There are three ways to demonstrate preemption: (1) express, (2) field, and (3) conflict. *Samian Group, LLC, v. Coopersburg Associates, Inc.*, 650 F. Supp. 3d. 295, 317 (EDPA 2023). The first way that a law is preempted is through express preemption, when the statute itself states that it preempts state law. *Arizona v. United States*, 567 U.S. 387, 399 (2012)("There is no doubt that Congress may withdraw specified powers from States by enacting a statute containing an express preemption provision.").

The second way is field preemption, which is when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *C.E.R. 1988, Inc. v. Aetna Cas. And Sur. Co.*, 386 F.3d. 263, 269 (3d. Cir. 2004),

*see also Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461, 1480 ("Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislature.").

The Third way is Conflict preemption, where adhering to one law would render it impossible to follow the other. *See Walkup v. Santander Bank, N.A.*, 147 F. Supp. 3d 349, 356 (EDPA 2015)("Conflict preemption applies 'when it is impossible to comply with both federal and state law…either where compliance with both laws is impossible or where state law erects an obstacle to the accomplishment and execution of the full purposes and objectives of congress.")

Briefly, Evie's claims of discrimination based on public accommodation discrimination are not preempted, as there is no federal statute that prohibits discrimination in public accommodations based on sex. *See* 42 U.S.C.A. §2000a (Guaranteeing access to public accommodations "without discrimination or segregation on the ground of race, color, religion, or national origin.") Even more, the PHRA is a police power of the state. 43 Pa. Stat. §952 ("This act shall be deemed an exercise of the police power of the Commonwealth for the protection of the public welfare, prosperity, health and peace of the people of the Commonwealth of Pennsylvania."). The PHRA claim in employment is not preempted as it is read with Title VII. *See* 42 U.S.C. §2000e-7.

The PFEOA claim is also not preempted by Title IX. Courts always "start with the assumption that the police power of the States were not to be superseded" absent a "clear and manifest purpose of congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). The PFEOA is an exercise of the police power of the Commonwealth. 24 Pa. Stat. § 5002(d)("This act shall be deemed an exercise of the police power of the Commonwealth for the protection of the public welfare, prosperity, health and peace of the people of the Commonwealth of Pennsylvania.").

There is no express language in Title IX that indicates that the obligations in the act supersede or displace the PFEOA. The implementing regulations contain a single narrow preemption clause: “[t]o the extent of a conflict between State or local law and title IX as implemented by §§ 106.30, 106.44, and 106.45, the obligation to comply with” those sections "is not obviated or alleviated by any State or local law." 34 C.F.R. § 106.6(h). The aforementioned sections of the regulations govern the procedures and processes for responding to sexual harassment complaints. *Id.* They have nothing to do with the issues in Evie’s case. When the Department of Education wanted the Title IX regulations to override state law, it said so expressly and it limited that override to the harassment-complaint process. No comparable provisions reaches athletics or obligations at issue in this case.

The Third Circuit has applied this principle to a federal education statute. *See Pennsylvania v. Navient Corp.*, 967 F.3d. 273, 290 (3d. Cir. 2020). In *Pennsylvania v. Navient Corp.*, the issue was whether the Education Act preempted state consumer protection claims. *Id.* The Education Act expressly provided that the covered loans were not subject “any disclosure requirements of any state laws.” *Id.* at 288 (“Section 1098g provides that “[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act ... shall not be subject to *any* disclosure requirements of *any* State law.” 20 U.S.C. § 1098g)(emphasis added). The Court found that state consumer claims alleging affirmative misrepresentations rather than failures of disclosure were not preempted by the Education Act. *Id.* at 290. The same reasoning applies here. While the regulations indicate that the statute is preempted for the purposes of procedures and protocol related to sexual harassment protocol, it follows that the rest of the statute and claims are not preempted.

Second, the PFEOA is not preempted through the theory of field preemption. As discussed in this brief, Congress through it Spending Powers encourages states to adhere to educational policies, but these are not prohibitions rather they are conditions of accepting funds. *See Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 286 (1998). "[E]ducation is perhaps the most important function of state and local governments." There are no prohibitive federal laws that apply to education. *See, Brown v. Board*, 347 U.S. 483, 493 (1954), *see also San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 29 (1973). "The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various states, and we do no violence to the values of federalism and separation of powers by staying our hand." *Id.* at 35.

Third, it is impossible for there to be conflict preemption when there is no federal law to be in conflict with. Again, Title IX is a spending clause legislation. *Id.* Congress involves itself in education through other spending clause legislation. *See* Individuals with Disabilities Education Act 20 U.S.C. §1400 *et seq.*, Family Education Rights and Privacy Act, 20 U.S.C. §1232 *et seq.*, Title VI, 42 U.S.C. §2000d, Section 504, 29 U.S.C. §794, Higher Education Act, 20 U.S.C. §1001 *et seq.* Again, these are all spending clause legislation, meaning the recipients can choose whether to take on the strings attached to the money.

Even more, no conflict exists between Swarthmore's obligations under Title IX and its obligations under the PFEOA and PHRA. *See B.P.J.* at 2372. *B.P.J.* held only that Title IX *permits* a State to limit girls' and women's teams to individuals who were assigned-female-at-birth (biological females). *B.P.J.* at 2372. The Court described whether transgender women and girls may participate as something that "may be a debated *policy* question," separate from "the *legal* question for Title IX purposes." *B.P.J* at 2372. The Court also expressly left open "the distinct

question of whether, under Title IX…schools may allow [transgender females] to participate on girls' and women's sports teams…Nothing in this opinion is intended to decide that question.". *Id.* at n.1. Because Title IX neither requires nor forbids that choice, complying with Pennsylvania law and complying with Title IX are fully consistent. Swarthmore did both when it stopped implementing the unlawful Trans Ban and allowed Evie to enjoy the benefits of her other teammates. SAC at ¶¶90-93.

Lastly, Pennsylvania courts have declined to follow a narrower federal reading of "sex." In *Cerra v. East Stroudsburg Area School District*, 299 A.2d 277, 280 (Pa. 1973), the Pennsylvania Supreme Court held that discharging a teacher because of pregnancy was "sex discrimination pure and simple" under the PHRA. Three years later, the United States Supreme Court held that excluding pregnancy from a disability plan was not sex discrimination under Title VII. *General Electric Co. v. Gilbert*, 429 U.S. 125, 136 (1976), superseded by statute, Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2076. Despite this Supreme Court finding, the Commonwealth Court continued to follow *Cerra* and the finding that discriminating against someone because they are pregnant is discrimination based on sex. "This Court is not compelled by *Gilbert's* construction of Title VII of the Federal Civil Rights Act of 1964 to construe the Pennsylvania Human Relations Act in the same fashion." *Anderson v. Upper Bucks Cnty. Area Vocational Tech. Sch.*, 373 A.2d 126, 129 (Pa. Commw. Ct. 1977).

### III. The Second Amended Complaint Sufficiently States a Claim for Intentional Infliction of Emotional Distress

Defendants challenge Count II (intentional infliction of emotional distress against all Defendants), Count IV (aiding and abetting that tort, against the NCAA), and Count V (civil conspiracy against all Defendants). Swarthmore Defs. Mot. to Dismiss Second Am. Compl. at 10–12; NCAA's Mot. to Dismiss Second Am. Compl. at 6–10. Plaintiff answers them together. While

Defendants argue the NCAA policy cannot be outrageous because *B.P.J.* held that Title IX permits sex-separated teams, that argument fails to recognize that the SAC does not allege only that Swarthmore applied an eligibility rule. It alleges that school officials with authority over Evie withheld team benefits after acknowledging in writing the emotional damage the restrictions caused, and that they continued for two months while calls made on her behalf went unanswered. The NCAA, for its part, addressed Evie's circumstances directly and approved the restrictions Swarthmore imposed on her.

### A. Pennsylvania Recognizes the Tort, and the Pleading Standard Is Settled

Swarthmore suggests that the tort may not exist in Pennsylvania. Swarthmore Defs.' Mot. to Dismiss Second Am. Compl. at 10 (citing *Kelly v. Jones*, 148 F. Supp. 3d 395, 405 n.2 (E.D. Pa. 2015)). The Pennsylvania Supreme Court has not formally adopted Restatement (Second) of Torts § 46, but it has "cited the section as setting forth the minimum elements necessary to sustain such a cause of action." *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000). *See also Hoy v. Angelone*, 720 A.2d 745, 753 & n.10 (Pa. 1998). It has also allowed recovery for "serious mental or emotional distress directly caused by the intentional and wanton acts" of a defendant. *Papieves v. Lawrence*, 263 A.2d 118, 121 (Pa. 1970) (mishandling of a decedent's body). Both motions apply § 46 as Pennsylvania law. Swarthmore Defs. Mot. to Dismiss Second Am. Compl. at 10–11; NCAA's Mot. to Dismiss Second Am. Compl. at 6–8. The question is whether the SAC pleads its elements.

Under § 46, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability." Restatement (Second) of Torts § 46(1) (Am. L. Inst. 1965). *Taylor*, 754 A.2d at 651. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy*, 720 A.2d at 754

(quotation omitted). At the pleading stage the Court decides "as an initial matter whether the conduct at issue can reasonably be regarded as sufficiently extreme to constitute 'outrageousness' as a matter of law." *Simpson v. Phila. Sheriff's Off.*, 351 F. Supp. 3d 919, 926–27 (E.D. Pa. 2019) (quotation omitted). "Where reasonable men may differ, it is for the jury" to decide. Restatement (Second) of Torts § 46 cmt. h.

In fact, Restatement identifies circumstances that bear directly on this case. First, "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Id.* § 46 cmt. e. The comment lists "school authorities" among those "held liable for extreme abuse of their position." *Id.* Second, the actor's knowledge matters. Conduct "may become heartless, flagrant, and outrageous when the actor proceeds in the face of" knowledge that the other person is especially susceptible to emotional distress. *Id.* § 46 cmt. f. Third, recklessness is enough. Liability extends to an actor who proceeds "in deliberate disregard of a high degree of probability that the emotional distress will follow." *Id.* § 46 cmt. i.

### B. The Swarthmore Defendants' Conduct Can Reasonably Be Regarded as Outrageous

Courts in this District have allowed a claim for intentional infliction of emotional distress to proceed against a college that knew of the harm a student was suffering and persisted in its course. In *Doe v. Moravian College*, the court denied a motion to dismiss where the college, after learning that a student had been assaulted, took no action against the students responsible, reprimanded her, and discouraged her from pursuing the Title IX process. No. 5:20-cv-00377, 2021 WL 843603, at *2–5 (E.D. Pa. Mar. 5, 2021). The court held that she had "sufficiently alleged outrageous conduct, on the part of Moravian College, that intentionally or recklessly caused

serious emotional distress." *Id.* at *5.[6] *See also MGJ v. Sch. Dist. of Phila.*, No. 17-318, 2017 WL 2277276, at *16 (E.D. Pa. May 25, 2017) ("A jury could find outrageousness" where a provider of services to a student "allegedly knew about MGJ's disabilities rendering her more susceptible" to harm and concealed known misconduct). The Second Amended Complaint alleges conduct by officials who held authority over Evie's participation in the program and who knew the harm their decisions were causing. Each individual defendant held a position of authority over Evie's life as a student athlete. Koch, the Director of Athletics, had "full and final responsibility" for who could compete and for the services and benefits given to student-athletes. SAC ¶ 25. Gomez and Epps-Chiazor shared that responsibility. SAC ¶¶ 29, 33. Epps-Chiazor was the Assistant Athletic Director for Compliance and Diversity and Inclusion. SAC ¶ 32. Carroll was Evie's head coach, with "full responsibility and control over the operations of the team." SAC ¶ 21. Evie, a team captain, depended on them for her place on the team and for the ordinary support every team member received. SAC ¶¶ 51, 53.

Defendants used that authority to separate Evie from her team in ways the NCAA policy did not require. The policy barred her from competing in women's events. It also provided that she could practice with the team and "receive all other benefits applicable to student-athletes who are otherwise eligible for practice." NCAA, *Participation Policy for Transgender Student-Athletes* (effective Feb. 6, 2025). Swarthmore nonetheless barred Evie from team transportation, from the food provided to the team, from coaching at meets; and care by the College's athletic trainers

---

[6]The court later granted summary judgment to the college on this claim because the plaintiff did not offer competent medical evidence of her distress. *Doe v. Moravian Coll.*, No. 5:20-cv-00377, 2023 WL 144436, at *10–11 (E.D. Pa. Jan. 10, 2023) (citing *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987)). That ruling concerned proof after discovery. It did not disturb the pleading-stage holding.

before and after races. SAC ¶¶ 64(i), 70. It told her she could lose her eligibility if she broke these rules. SAC ¶ 70 (second paragraph so numbered); and that no federal or Pennsylvania law applied to her situation. SAC ¶¶ 64(a)–(e), 68. Regulations defining sex under the PFEOA and the PHRA to include gender identity had been in effect since August 16, 2023. 16 Pa. Code § 41.206. Here, Swarthmore continued to allow non-binary athletes who do not identify as female to run on the women's team. SAC ¶ 64(l): at the Widener meet on March 28, 2025, Evie drove herself, paid her own entry fee, ran in a jersey she bought herself, and did not seek treatment for a bleeding ankle because of the restrictions. SAC ¶¶ 79–82.

Swarthmore imposed these restrictions knowing the harm they would cause. On the day Gomez and Epps-Chiazor told Evie of the restrictions, Gomez wrote to the NCAA that the damage, "emotional and otherwise," that the policy caused affected student-athletes was "immeasurable and unfair." SAC ¶ 65. Evie was, on information and belief, the only athlete at Swarthmore to whom the policy applied. SAC ¶ 2. At the same meeting, Swarthmore acknowledged that Evie's safety at meets "could be an issue," and then left it to Evie to contact meet hosts and request additional security. SAC ¶ 64(j). The SAC thus alleges that Swarthmore understood emotional harm to be a likely result of its course and went forward. That is, at least, "deliberate disregard of a high degree of probability that the emotional distress will follow." Restatement (Second) of Torts § 46 cmt. i.

The restrictions then continued for two months. Within days of the meetings at which they were imposed, Evie began cutting herself. SAC ¶ 71. Her sibling left voicemails for Koch and Gomez  to which the officials never responded. Epps-Chiazor responded more than two weeks later, and only after Evie pleaded with her to do so. SAC ¶¶ 72, 76. In that plea, Evie told Epps-Chiazor that it was "exhausting" to balance her studies, her training, and her duties as captain while

also having "to fight for my rights to compete and be a member of this team." SAC ¶ 76. When Evie asked about her status and requested that the College bring a speaker to campus, Epps-Chiazor confirmed that the restrictions would remain. SAC ¶¶ 74–75. When Evie asked Carroll about her remaining eligibility, he referred her to the compliance office. SAC ¶ 77. Because she was required to enter meets unattached, Evie had to arrange her own entry with host schools. SAC ¶¶ 78, 83, 89. On April 2, 2025, one host told her she could run only in the men's races. SAC ¶ 84. After receiving that message, Evie had a panic attack during a seminar presentation, told a friend she wanted to kill herself, and was walked to the College's counseling center for an emergency appointment. SAC ¶¶ 85–87.

On April 11, 2025, Swarthmore reinstated Evie in full. SAC ¶ 90. The SAC alleges no change in the NCAA policy in the interim, and it alleges that the policy remains in force. SAC ¶ 14. Swarthmore's reversal supports the inference that the restrictions it imposed for two months had not been compelled by any external requirement.

A reasonable jury could regard this course of conduct as outrageous. The allegations describe school officials who controlled a student's participation in a program, separated her from her teammates in ways their governing rule did not require, falsely told her the law gave her no protection, acknowledged in writing the damage they were causing, left her to arrange her own safety and her own entry to meets, and callously refused to return calls made on her behalf. That is an abuse of a position of authority over a student, carried out with knowledge of the harm it was causing. Restatement (Second) of Torts § 46 cmts. e, f, i.

### C. Defendants' Argument That They Cannot be Held Responsible for Intentional Infliction of Emotional Distress Under *B.P.J.* and Related Cases Wholly Fails

Defendants argue that conduct the Supreme Court has approved cannot be outrageous. Swarthmore Defs. Mot. to Dismiss Second Am. Compl. at 11; NCAA's Mot. to Dismiss Second

Am. Compl. at 7. That argument fails for three reasons. First, *B.P.J.* held only that Title IX permits schools to limit women's and girls' teams to biological females. 146 S. Ct. at 2371, 2373. It did not address how a school may treat a transgender woman it keeps on a women's team, and it did not address Pennsylvania law. Second, the benefit restrictions were not required by the NCAA policy, so Swarthmore cannot attribute them to an eligibility rule the Supreme Court approved. And third, the outrageousness inquiry looks to the conduct and its circumstances, including the actor's position, its knowledge, and the manner in which it acted. Restatement (Second) of Torts § 46 cmts. e, f.

The cases Defendants cite are readily distinguishable. None of the cases on which Defendants rely involved officials with authority over a student who acknowledged the emotional damage their decisions were causing and then continued to inflict harm.

### D. The Second Amended Complaint Sufficiently Pleads Severe Emotional Distress and Physical Harm

Neither motion disputes that the Second Amended Complaint alleges severe distress. To the extent Pennsylvania law also requires "some type of resulting physical harm," *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122–23 (Pa. Super. Ct. 2004), the Second Amended Complaint alleges it. Evie cut herself with a razor, hid the wounds under arm sleeves when she raced, suffered a panic attack, told a friend she wanted to kill herself, and was taken to the College's counseling center for an emergency appointment. SAC ¶¶ 71, 81, 85–87. Self-inflicted wounds are physical injury. Courts applying Pennsylvania law have also found the requirement met by "symptoms of severe depression, nightmares, stress and anxiety requiring psychological treatment." *Lujan v. Mansmann*, 956 F. Supp. 1218, 1228 (E.D. Pa. 1997) (quotation omitted). The requirement that distress be "supported by competent medical evidence," *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987), concerns proof. It is not a pleading requirement.

*Kornegey v. City of Philadelphia*, 299 F. Supp. 3d 675, 683–84 (E.D. Pa. 2018). *See also Humphries v. Pa. State Univ.*, 492 F. Supp. 3d 393, 410 (M.D. Pa. 2020) (argument that plaintiff "must present competent medical evidence to support his claim is premature" on a motion to dismiss).

### E. The NCAA Is Liable for Its Own Conduct and for Aiding Swarthmore's Conduct

The NCAA argues that it adopted a nationwide policy and did not direct conduct at Evie. NCAA's Mot. to Dismiss Second Am. Compl. at 7–8 (citing *Angus v. Shiley Inc.*, 989 F.2d 142, 147–48 (3d Cir. 1993)). *Angus* was a products liability case. It declined to extend the tort to wrongdoing "directed at a class of consumers rather than a particular plaintiff," and it recognized liability for conduct "either aimed specifically at the plaintiffs or likely to have a special impact on them as distinguished from a large group of persons." 989 F.2d at 147–48. The Second Amended Complaint alleges conduct of the second kind. The NCAA did not merely issue a rule. Swarthmore sought the NCAA's active guidance, and the NCAA "verbally confirmed unattached competition would be appropriate given [Swarthmore's] compliance" with the policy. SAC ¶¶ 65, 75, 115. The NCAA also told Swarthmore that it "would not approve competition from a birth certificate that had been changed from its original gender assignment." SAC ¶ 75. Evie's birth certificate identifies her sex as female, and she was, on information and belief, the only transgender woman athlete at Swarthmore. SAC ¶¶ 2, 40. The reasonable inference is that the NCAA was addressing Evie's circumstances. The NCAA also provided guidance on how to implement the restrictions and remained in communication with the College while they were in force. SAC ¶¶ 116, 150.

The same allegations support Count IV. The NCAA acknowledges that Pennsylvania follows Restatement (Second) of Torts § 876. NCAA's Mot. to Dismiss Second Am. Compl. at 8

(citing *Austin v. Hill*, No. 11-2847, 2014 WL 1386338, at *13 (E.D. Pa. Apr. 9, 2014)). Under § 876(b), one is liable for harm resulting from the tortious conduct of another if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76, 79–80 (Pa. 2023) (quoting Restatement (Second) of Torts § 876(b)). The Pennsylvania Supreme Court applied that provision in recognizing a claim for aiding and abetting fraud. *Id.* at 84. Pennsylvania courts have applied it to other torts as well. *Koken v. Steinberg*, 825 A.2d 723, 731–32 (Pa. Commw. Ct. 2003) (breach of fiduciary duty). The NCAA disputes only the sufficiency of the allegations. NCAA's Mot. to Dismiss Second Am. Compl. at 8–9. They are sufficient. Swarthmore's Associate Director of Athletics admitted in writing to the NCAA that the policy caused affected student-athletes emotional damage that was "immeasurable and unfair." SAC ¶ 65. With that knowledge, the NCAA approved the arrangement for Evie, declined to recognize her birth certificate, and advised Swarthmore on implementing its cruel practices. SAC ¶¶ 75, 115–16. The NCAA's remaining argument, that Count IV fails for want of a predicate claim against Swarthmore (*see* NCAA's Mot. to Dismiss Second Am. Compl. at 8), fails for the reasons given in Parts B through D.

## IV. The Second Amended Complaint Sufficiently States Claims For Civil Conspiracy

A civil conspiracy requires "a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose," "an overt act done in pursuance of the common purpose," and "actual legal damage." Swarthmore Defs.' Mot. to Dismiss Second Am. Compl. at 11–12 (quoting *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. Ct. 2004)). Defendants argue that the Second Amended Complaint alleges no agreement, no malice, and no underlying tort. Swarthmore Defs.' Mot. to Dismiss Second Am. Compl. at 11–12; NCAA's Mot. to Dismiss Second Am. Compl. at 9–10.

The SAC alleges an agreement between Swarthmore and the NCAA. A plaintiff need not plead "direct and positive testimony of a collusive agreement." *Baker v. Rangos*, 324 A.2d 498, 506 (Pa. Super. Ct. 1974). It is enough to "allege facts that if proved will support an inference of the combination and its intent." *Id.* The Pennsylvania Supreme Court has likewise recognized that a conspiracy "must ordinarily be proved by circumstantial evidence." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 473 n.9 (Pa. 1979) (quotation omitted). The Second Amended Complaint does not rely on parallel conduct or on labels. It alleges that Swarthmore sought the NCAA's guidance on how to implement its restrictions, that the NCAA provided it, and that the NCAA confirmed the unattached arrangement and declined to recognize Evie's birth certificate. SAC ¶¶ 65, 75, 115–16, 150. Those are communications between the alleged conspirators about the plan carried out against the plaintiff.

The NCAA contends that Swarthmore's later decision to reinstate Evie shows there was no agreement. NCAA's Mot. to Dismiss Second Am. Compl. at 10. It shows only that the restrictions ended on April 11, 2025. SAC ¶ 90. A combination that ends after two months existed during those months, and the overt acts committed in that period caused the injuries the SAC alleges. Nor does Swarthmore's "choice" to implement the policy, SAC ¶ 6, suggest independent action. A party that chooses to join a common plan is a party to it.

The Second Amended Complaint also pleads malice. Malice is "an intent to injure," and "[t]his unlawful intent must be absent justification." *Thompson Coal*, 412 A.2d at 472. The Second Amended Complaint alleges that Defendants acted in concert "with the common purpose of discriminating against Evie" on the basis of her sex, and that the discrimination was willful and intentional. SAC ¶¶ 22, 26, 30, 34, 36, 63, 71. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Defendants rely on the statement

that malice must be the “sole purpose” of the conspiracy. NCAA’s Mot. to Dismiss Second Am. Compl. at 10 (quoting *NRA Grp., LLC v. Durenleau*, 154 F.4th 153, 172 (3d Cir. 2025)). The decisions that apply that standard were decided on evidentiary records. *Thompson Coal* affirmed summary judgment where “many facts” of record showed that the defendant acted “to advance the legitimate business interests of his client.” 412 A.2d at 472. *NRA Group* was also decided on summary judgment. It held that the claim failed for want of a predicate violation and addressed malice “for good measure.” 154 F.4th at 172–73. In *Bro-Tech Corp. v. Thermax, Inc.*, this Court granted summary judgment because the plaintiffs’ own evidence showed that the defendants acted for business advantage. 651 F. Supp. 2d 378, 418–19 (E.D. Pa. 2009).

On motions to dismiss, courts in this District have allowed conspiracy claims to proceed where the complaint supports an inference of intent to injure, even if the defendants also had other aims. *Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp. 3d 541, 558–59 (E.D. Pa. 2018) (malice “would not be negated by an ultimate business objective of increasing business profits if injury to Aetna is the intended means for achieving that end”); *Houser v. Feldman*, 600 F. Supp. 3d 550, 571–72 (E.D. Pa. 2022) (allegations that defendants “were driven, at least in part . . . by a desire to harm Plaintiff” sufficed “at this stage”).

The only justification Defendants offer is compliance with the NCAA policy. The policy itself stated that “schools are subject to local, state and federal legislation and such legislation supersedes the rules of the NCAA.” SAC ¶ 57. It did not require the benefit restrictions. Whether Defendants had a legitimate justification for withholding team transportation, meals, coaching, and athletic training care from one athlete, on the basis of her sex, after recognizing and acknowledging the damage that they were causing, is a question the Court cannot resolve against Plaintiff on the pleadings.

Finally, the underlying tort is intentional infliction of emotional distress, which the SAC adequately pleads for the reasons above. Defendants' remaining argument, that the conspiracy claim must fall with the underlying claim *(see* Swarthmore Defs.' Mot. to Dismiss Second Am. Compl. at 12 (citing *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 405–06 (3d Cir. 2000); NCAA's Mot. to Dismiss Second Am. Compl. at 10), therefore fails as well.

**V. Any Deficiency Should Be Addressed By Amendment, Not Dismissal With Prejudice**

The NCAA asks that dismissal be with prejudice because Plaintiff has amended twice. NCAA's Mot. to Dismiss Second Am. Compl. at 13. Neither amendment followed a ruling by this Court. Plaintiff amended once in response to Defendants' first motions and once by stipulation after *B.P.J.* was decided. *See* First Am. Compl. (Dkt. No. 18) and Order dated July 17, 2026 (Dkt. No. 28). This Court has never identified any deficiency in the pleadings. If the Court finds any element of the Second Amended Complaint's claims insufficiently pleaded, Plaintiff respectfully requests leave to amend. *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) ("[I]f a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile.").

**CONCLUSION**

For these reasons, Plaintiff respectfully requests that the Court deny both motions to dismiss the Second Amended Complaint.

Respectfully submitted,

**SPECTOR GADON ROSEN VINCI P.C.**

By: /s/ Susan M. Cirilli
Susan M. Cirilli, Esquire
Pa. Atty I.D. No. 313519
One Logan Square, Suite 1800
130 N. 18th Street
Philadelphia, PA 19103
P: 215.241.8887
scirilli@sgrvlaw.com

By: /s/ Alan Epstein
Alan Epstein, Esquire
Pa. Atty ID No. 02346
One Logan Square, Suite 1800
130 N. 18th Street
Philadelphia, PA 19103
P: 215.241.8832
aepstein@sgrvlaw.com

Date: November 20, 2026